## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SUSAN J. STACK, | ) | CASE NO. 4:08CV3148 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM |
| v. | ) | AND ORDER |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on Plaintiff Susan J. Stack's appeal of a "final decision" by the Commissioner of the Social Security Administration ("Commissioner") finding that Stack was not disabled under Title XVI of the Social Security Act (the "Act"). Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under the Act.  The Court has reviewed the record, the parties' briefs, and the applicable law and finds that the decision of the Administrative Law Judge ("ALJ") is not supported by the substantial evidence on the record.  The Court remands this case to the Commissioner pursuant to sentence four of Section 205(g), 42 U.S.C. § 405(g).[1]

## BACKGROUND

### 1.    Procedural Background

Stack filed her application for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq*. (Transcript ("Tr.") at 16).  The application was denied

---

[1]Sentence four provides: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

initially and again on reconsideration. (Tr. at 16).  On September 14, 2007, following a hearing, the ALJ found that Stack was not disabled as defined under the Act. (Tr. at 16-30). On May 15, 2008, the Appeals Council denied Stack's request for review. (Tr. at 5-7), and the ALJ's September 14, 2007, decision stands as the final decision of the Commissioner.

### 2.    Factual Background

In her application for disability, Stack stated that she was born on May 20, 1954, and that she became unable to work on June 1, 1967. (Tr. at 64).  At the administrative hearing, Stack amended her alleged onset date to October 27, 2004, the date of the filing of her Title XVI claim. (Tr. at 349).  Stack's past relevant work included work as a cashier, general cleaner, and security guard. (Tr. at 28).  In completing her disability report, she stated that she last worked as a cashier in December, 2003 (Tr. at 89), but that she did not perform any substantial gainful work activity after October 4, 2004. (Tr. at 18).  At the hearing, Stack testified that she completed the 10th grade in school, and obtained her GED. (Tr. at 352).  In her application, Stack alleged disability due to a left shoulder injury, right arm pain, scoliosis, sinusitis, headaches, depression, and bipolar disorder. (Tr. at 18).

A review of the medical records predating her alleged onset of disability reveals that, in April 1995, x-rays of Stack's lumbar spine showed some degenerative changes, convexity to the left, and disc space narrowing, but no fracture, spondylosis, or spondylolisthesis. (Tr. at 236).  On January 15, 1997, x-rays of her right shoulder showed dislocation of the humeral head to the glenoid. (Tr. at 235).  On June 5, 1997, Stack presented to her treating physician, T.S. Robertson, M.D., with complaints of pain in her left foot and ankle. (Tr. at 214).  Dr. Robertson diagnosed left leg pain and prescribed Relafen and an ace bandage. (Tr. at 214).

2

Stack continued to see Dr. Robertson on a regular basis for chronic obstructive pulmonary disease, chronic bronchitis, asthma, chronic sinusitis, and complaints of pain in her knee. (Tr. at 210, 213-214).  On June 6, 2000, Stack visited Dr. Robertson with complaints of pain in her neck. (Tr. at 208).  Dr. Robertson diagnosed Stack with cervical strain and prescribed Relafen, Flexeril, and Allegra. (Tr. at 208).

On July 17, 2001, Stack underwent x-rays of her chest and lumbar spine after she fell into a wall at work. (Tr. at 234, 340).  The x-rays showed advanced degenerative changes involving disc space at L5-S1 and mild degenderative changes involving disc spaces from L2-3 through L4-5. (Tr. at 234).  She was placed in a shoulder immobilizer and prescribed medications. (Tr. at 233).  Following her fall, Stack saw a chiropractor, Paula J. Wiese, D.C., from July of 2001, until September of 2001. (Tr. at 172-75, 195).

On August 29, 2002, Stack returned to Dr. Robertson for follow-up treatment of the shoulder she had injured when she fell at work. (Tr. at 340).  Dr. Robertson noted that her left shoulder was weak and had a limited range of motion. (Tr. at 341).  The record shows that Stack was subsequently evaluated by another of her treating physicians, Brett Fischer, MD, and underwent an MRI of her left shoulder on August 30, 2002. (Tr. at 322).  The MRI revealed AC joint arthritis and hypertrophy with narrowing of the subacromial space, no evidence of rotator cuff tear, small joint effusion, and possible superior labral tear. (Tr. at 322).

On September 3, 2002, Dr. Robertson reasoned that Stack may have suffered a left shoulder anterior labrum tear, and concluded she at least had a shoulder subluxation from her injury at work. (Tr. at 339).  On December 11, 2002, Stack returned to see Dr. Robertson with complaints of pain after reaching for an item on a shelf at work and

3

wrenching her previously injured shoulder. (Tr. at 166).  Dr. Robertson noted that Stack "has had stiffness and pain that has not been responsive to conservative treatment." (Tr. at 166).

On December 19, 2002, Stack's treating physician, B.W. Fischer, M.D., performed a left shoulder arthroscopy and labrum tear repair. (Tr. at 320).  Dr. Fischer wrote that Stack tolerated the procedure well and there had been no complications. (Tr. at 321).

Stack also has a history of significant mental illness.  On September 21, 2004, her mental health counselor, Cindy J. Cusick, C.M.S.W., L.M.H.P., wrote in a Vocational Rehabilitation questionnaire that Stack's depression and adjustment disorder impeded her ability to work (Tr. at 176).  Specifically, Cusik reported that Stack suffered from major depressive disorder: recurrent and adjustment disorder: depressed mood. (Tr. at 176). Cusik had first seen Stack on October 1, 2003. (Tr. at 222).

On October 13, 2004, Stack's chiropractor, Ms. Wiese, wrote in a Vocational Rehabilitation questionnaire that due to Stack's lower back injury in July of 2001, "heavy lifting of 30 lbs or more, excessive standing of 5 hours or more will cause discomfort and pain in the patient's low back as well as radiating pain down the legs." (Tr. at 171).  Ms. Wiese also concluded that Stack's obesity and smoking contributed to her instability in her lower back, and while Stack could work, she had physical limitations as to what she could and could not do. (Tr. at 171).

On October 6, 2004, three weeks prior to her alleged onset of disability, Stack presented to the BryanLGH Medical Center with thoughts of suicide by overdose (Tr. at 179-80).  Jasung Kim, M.D., examined Stack and diagnosed her with personality disorder and bipolar/mood disorder, and assigned Stack a Global Assessment of Functioning (GAF)

4

score of 29.[2] (Tr. at 181).  Dr. Jasung treated Stack with Tegretol and Seroquel, and discharged her on October 12, 2004, with an improved GAF score of 45. (Tr. at 179).  Dr. Jasung stated that her prognosis was "guarded at this time." (Tr. at 179).

At the request of the Nebraska Disability Determinations Section ("DDS"), Stack visited Virgil Ottun, M.D., for a consultative examination on February 23, 2005. (Tr. at 228). Dr. Ottun diagnosed Stack with generalized musculoskeletal tenderness which may represent fibromyalgia; history of surgery on the left shoulder with some continuing residual symptomatology; and some degree of generalized osteoarthritis. (Tr. at 229).  He opined that Stack would "not be able to work in a job situation that involves repeated bending, stopping, lifting or excessive use of her upper extremities." (Tr. at 229).  He further concluded that, due to her symptoms, she had difficulty lifting things and clothing herself and she could not sit for more than two to three hours without increasing shoulder and back pain. (Tr. at 228).  Dr. Ottun reasoned that Stack could only stand for about an hour and could walk only one block before developing more back shoulder and leg pain. (Tr. at 228).

On February 5, 2005, Cusik informed the DDS that Stack "had been compliant with her mental health care, however, she has no money, no job and no insurance." (Tr. at 222).  Cusik reported that Stack suffered from major depression which "developed into suicidal ideation with attempt." (Tr. at 222).

---

[2] The Global Assessment of Functioning ("GAF") Scale is a rating system for reporting the clinician's judgment of the individual's overall level of functioning. *American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision (DSM-IV-TR) 34 (4th ed. 2000).  A score of 50 or lower indicates "serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) or any serious impairment in social occupational or school functioning (e.g., no friends, inability to keep job)." *Id*. at 34.

5

On March 5, 2005, Stack presented to Patricia J. Blake, Ph.D., for a consultative psychological evaluation. (Tr. at 237). Stack appeared agitated and annoyed (Tr. at 26, 237, 240). On examination, Dr. Blake noted that Stack was alert and oriented, her conversation was normal, she had no psychomotor disturbance, hallucinations, or delusions, and she could receive, organize, analyze, remember, and express information appropriately (Tr. at 238). Stack's attitude at the time was noted as "guarded to hostile." (Tr. at 238). Her mood was angry and her "affect was marginally inappropriate." (Tr. at 238). Dr. Blake observed "signs of what might have been tension or anxiety." (Tr. at 238). Dr. Blake assessed depression and personality disorder, and assigned Stack a GAF score of 60. (Tr. at 239). Dr. Blake found that Stack had no restrictions in her activities of daily living due to mental health issues, but she would likely have difficulties maintaining social functioning (Tr. at 239). Dr. Blake concluded that Stack could complete daily living activities, manage her own finances, understand, remember, and carry out simple tasks, and respond appropriately to coworkers and supervisors. (Tr. at 239-41).

A state agency medical consultant working for DDS, Donald J. Larson, M.D., performed a review of the medical records in the file on March 15, 2005, and provided a set of opinions as to Stack's residual functional capacity ("RFC"). (Tr. at 281-288). Dr. Larson concluded that Stack would be able to lift 20 pounds occasionally, and ten pounds frequently; that she would be able to sit, stand and walk six hours out of an eight hour work day; that she would only occasionally be able to climb, stoop, kneel, crouch and crawl; and that she would need to avoid repetitive overhead reaching. (Tr. at 281–288).

Stack visited Dr. Fischer on March 29, 2005, following a two-year absence. (Tr. at 248). She informed Dr. Fischer that she felt she was completely disabled at this point as

6

she was unable to elevate her arms overhead and unable to get them behind her. (Tr. at 249). Physical exam revealed limited flexion and abduction and pain with any motion and the x-rays showed no significant bony abnormalities. (Tr. at 249). Dr. Fischer concluded that Stack "had pain basically everywhere that we evaluate," and he ordered a MRI of her shoulder in attempt to understand what was causing her chronic pain. (Tr. at 249).

On April 26, 2005, Stack visited Dr. Fischer for review of her MRI of the left shoulder. (Tr. at 250). Dr. Fischer reported that the MRI showed some tendotic changes in the supraspinatus tendon but no obvious full thickness rotator cuff tear; according to Dr. Fischer, the MRI did not "fully explain all of the discomfort that" Stack was experiencing. (Tr. at 250). He gave Stack a steroid injection in the left shoulder and advised her to use ice and begin to use the arm as comfort allowed. (Tr. at 262). Stack reported on May 5, 2005, that the injection had provided some immediate relief and eliminated more than 30 to 40 percent of her discomfort, but she reported later recurrence of the pain. (Tr. at 251). Dr. Fischer advised of the need for a repeat arthroscopy. (Tr. at 251).

On July 8, 2005, Stack called Dr. Robertson and told him she no longer could afford her medications and was going to stop taking them. (Tr. at 312). Dr. Robertson offered Stack financial assistance, and she said she would "think about it." (Tr. at 312).

On October 5, 2005, Cusick completed a Mental Capacities Evaluation ("RFC-Mental"), in which she opined that Stack was moderately limited in her ability to understand and remember simple instructions, and carry out detailed instructions; moderately to markedly limited in her ability to carry out simple instructions and remember detailed instructions; moderately limited in her ability to work with others; and markedly limited in her ability to complete a normal workday, perform activities within a schedule,

7

sustain an ordinary routine, maintain concentration and attention for extended periods, and make simple, work-related decisions. (Tr. at 304-05).  Cusick also opined that Stack was markedly limited in her ability to interact with the public, ask simple questions, respond to supervisors, and maintain socially appropriate behavior; and moderately limited in her ability to get along with coworkers. (Tr. at 305). Finally, Cusick reported that Stack was markedly limited in her ability to take normal precaution around hazards, travel to unfamiliar places, and set goals; and moderately to markedly limited in her ability to respond to changes in the work setting (Tr. at 306). Due to these limitations, Cusick concluded that Stack could work zero to three days per week for less than three hours per day. (Tr. at 307).

On October 5, 2005, Cusick also completed a Mental Health Statement of Ability to Do Work-Related Activities ("AWA-Mental").  (Tr. at 308).  She wrote that Stack had fair ability to relate to coworkers, interact with supervisors, and deal with work stresses; poor ability to function independently, deal with the public, and maintain attention or concentration; and good ability to follow work rules and use judgment (Tr. at 309).  She also reported that Stack had fair ability to understand, remember, and carry out simple and detailed instructions; and fair ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations; and demonstrate reliability. (Tr. at 309-10).

Dr. Fischer completed a Medical Impairment Evaluation and Physical Capacities Evaluation ("RC-Physical") at the request of Stack's attorney on October 25, 2005. (Tr. at 292).  Dr. Fischer reported that Stack had pain as a result of her right shoulder problem that interfered with attention and concentration; that she could only lift up to ten pounds

8

occasionally and frequently; that she could only occasionally squat or crawl, but should seldom climb, reach above shoulder level, work at unprotected heights or work around moving machinery. (Tr. at 292-297).  Dr. Fischer further opined that Stack could work eight hours in a work day, but not for a full month. (Tr. at 296).

### 3.    Administrative Hearing

At the hearing, Stack testified that her last work ended because she was unable to perform the necessary physical requirements due to her shoulder pain. (Tr. 358–361).  She also testified that she had pain in her shoulders, neck, and back which affected her ability to perform daily activities.  She estimated that she could no longer walk as much as a city block before she needed to sit; she could stand 15 to 20 minutes, but needed to lean on something; and she could sit for long periods if she could move around and keep her arms on an armrest. (Tr. at 370-372).  Stack further testified that she was limited in her ability to bend at the waist and squat because her back began to hurt; she had trouble climbing stairs because her knees would not hold her; she had difficulty lifting things or attempting to reach away from her body, side, or in front due to her arm pain; and she had difficulty using her left hand because she had lost dexterity. (Tr. at 372-373).  She described her typical daily activities as including simple meal preparation; washing dishes, while leaning against the sink; limited laundry; and no housekeeping. (Tr. at 377-378).  She spent most of her day resting in a chair or recliner, for at least four to five hours, and she left her house only when absolutely necessary. (Tr. at 380-383).

With regard to her mental functioning, Stack testified that she was depressed and felt worthless; she was negative, and did not want to be around other people. (Tr. at 383).

9

She reported difficulty getting along with coworkers and the general public and advised that she did not handle stressful situations well. (Tr. at 384–386).

The ALJ then asked the vocational expert ("VE") to assume a hypothetical claimant of Stack's age, education, and work experience, who could lift and carry ten pounds frequently and twenty pounds occasionally, but who should avoid reaching overhead with the non-dominant left shoulder; stand, walk, and sit six hours each during an eight-hour workday; occasionally climb, balance, stoop, kneel, crouch, and crawl; and never work on ladders, ropes, or scaffolds. (Tr. at 389-90).  Further, the claimant could perform only unskilled, routine, repetitive jobs with normal supervision not requiring extended concentration, setting goals, or dealing with jobs changes; and requiring only brief or superficial interaction with coworkers, supervisors, and the public, without constant, intense, or frequent social interaction. (Tr. at 390). The VE testified that such a claimant could work as production worker (Dictionary of Occupational Titles ("DOT") code 652.685-094) (2,500 Nebraska jobs; 300,000 national jobs), packaging machine operator (DOT code 559.685-018) (1,500 Nebraska jobs; 100,000 national jobs); maid (DOT code 323.687-014) (1,500 Nebraska jobs; 250,000 national jobs), and cashier (DOT code 211.462-010 (5,000 Nebraska jobs; 750,000 national jobs); that each of the jobs she identified had a specific vocational preparation level (SVP) of one or two; and that her testimony was consistent with the DOT (Tr. 29, 390-91).

When the VE was asked to consider the ALJ's first hypothetical, but with the addition of the limitations Cusik found in her evaluation of Stack's Mental RFC, the VE concluded that Stack "would not be able to maintain work in the national [economy]." (Tr. at 394-395).  When the VE was asked to consider Dr. Fischer's evaluation concluding that

10

Stack would miss two to three days of work per month due to her physical limitations, the VE concluded that Stack "would not be able to maintain employment over – for a long period of time with an employer, due to the absenteeism." (Tr. at 396).

### 4.    The ALJ's Decision

On September 1, 2007, the ALJ issued her decision. (Tr. at 13-30).  The ALJ found that Stack had not engaged in substantial gainful activity since October 4, 2004. (Tr. at 18). In reviewing the record, the ALJ concluded that Stack had the following severe impairments: history of labral tear of the left shoulder, status post surgery in December 2002; osteoarthritis; depression; personality disorder; and obesity. (Tr. at 18).  She did not conclude, however, that Stack had an impairment or combination of impairments that met or equaled one of the listed impairments in 20 C.F.R. Part 404. Subpart P, Appendix 1. (Tr. at 19).  The ALJ found that Stack had the RFC to perform "light work" (Tr. at 21), but she reasoned that Stack could not perform any past relevant work. (Tr. at 28).  In consideration of her RFC finding, the ALJ concluded that "there are jobs that exist in significant numbers in the national economy" that Stack could perform. (Tr. at 29).  Consequently, the ALJ found that Stack "has not been under a disability, as defined in the Social Security Act." (Tr. at 30).

### STATEMENT OF ISSUES

In appealing the final decision of the ALJ, Stack raises three issues.  (Filing No. 12 at 13).  First, she contends that the ALJ erred when she failed to afford the medical opinions of Stack's treating physician, Dr. Fischer, significant weight.  Further, Stack argues that the ALJ committed reversible error when she dismissed the opinions of Stack's

licensed clinical social worker, Cusik, without properly considering the factors that would warrant the dismissal of Cusik's non-medical opinions.  Finally, Stack suggests that the ALJ did not adequately consider the *Polaski* factors, and consequently, erred in finding that Stack's subjective statements regarding her condition were not credible.  *See Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986).

## STANDARD OF REVIEW

When reviewing a Social Security disability benefits decision, the district court does not act as a fact-finder, re-weigh the evidence, or substitute its judgment for the judgment of the ALJ or the Commissioner.  *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995).  Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole.  *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir. 1996).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support a decision."  *Cox v. Apfel*, 160 F.3d 1203, 1206-07 (8th Cir. 1998).  In determining whether the evidence in the record is substantial, the court must consider "evidence that detracts from the [Commissioner's] decision as well as evidence that supports it."  *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)(internal quotations omitted).

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits.  *See* 20 C.F.R. § 404.1520(a) (1998); *Cox,* 160 F.3d at 1206.  Under the Commissioner's regulations, the determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's RFC and his or her age, education and work

12

experience. 20 C.F.R. § 404.1520(a); *Flanery v. Chater,* 112 F.3d 346, 349 (8th Cir. 1997). The Commissioner determines:  (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.  *Cox,* 160 F.3d at 1206.

At step three of the sequential evaluation, if the claimant is found to suffer from an impairment that is listed in the Appendix to 20 C.F.R. Part 404, Subpart P ("the listings") or is equal to such a listed impairment, the claimant will be determined disabled without consideration of age, education, or work experience.  *Flanery,* 112 F.3d at 349.  The listings specify the criteria for impairments that are considered presumptively disabling. 20 C.F.R. §§ 404.1525(a), 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1.

## DISCUSSION

After consideration of the ALJ's final decision, the parties' briefs, and the entire record, the Court finds that the substantial evidence on the record does not support the ALJ's decision.  Specifically, the Court concludes the evidence on the record does not support the ALJ's decision to disregard the findings of Stack's treating physician, Dr. Fischer, and her mental health counselor, Cusik.  The record also reveals that when the VE was asked to consider Stack's limitations, as defined by her treating physician and

13

mental health counselor, the VE concluded that Stark would not be able to maintain work "performed in the national economy." (Tr. at 395). Because the Court finds that the ALJ committed reversible error in regard to the first two issues Stack raised, the Court will not address the third issue regarding the ALJ's *Polaski* determination of Stack's credibility. The Court will reverse the final decision of the Commissioner and remand the case for proper consideration of the findings of Dr. Fischer and the Plaintiff's mental health counselor, Cusik.

### 1.    Failure to Afford the Medical Opinions of Dr. Fischer Substantial Weight

Upon review of the record, the Court finds that the ALJ's failure to afford substantial weight to the medical opinions of Stack's treating physician, Dr. Fischer, constitutes reversible error. "The opinion of a treating physician is accorded special deference under the social security regulations." *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). Thus, "[a] treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir.2000). "If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the opinion should be given controlling weight." *Krogmeier v. Barnhart,* 294 F.3d 1019, 1023 (8th Cir. 2002).

In the present case, Dr. Fischer's opinions are well-supported by the medical evidence in the record and the ALJ failed to demonstrate that those medical opinions were inconsistent with the substantial evidence in the record. Furthermore, "whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations also provide

14

that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." *Singh*, 222 F.3d at 452 (citing 20 C.F.R § 404.1527(d)(2)). In dismissing Dr. Fischer's medical opinions, the ALJ cited four reasons. None of these reasons, however, is a "good" reason to dismiss the credibility of Dr. Fischer's medical opinions.

The first reason the ALJ gave for her decision to dismiss Dr. Fischer's medical opinions is the fact that Dr. Fischer "opined on November 2, 2005, that Ms. Stack has severe pain and loss of motion from her <u>right</u> shoulder." (Tr. at 27). The ALJ noted that "[t]his is confusing as the remainder of the statement appears to be in agreement with his progress notes regarding her left shoulder treatment." (Tr. at 27). While at first glance Dr. Fischer's statement regarding Stack's *right* shoulder may appear to be contradictory to his other medical notes regarding Stack's left shoulder, other evidence in the record indicates that Stack has also experienced pain in her *right* shoulder. In fact the Commissioner's consulting physician, Dr. Ottun, noted on February 23, 2005, that Stack "has some degree of discomfort in the right shoulder as well." (Tr. at 228). Dr. Fischer's statement on November 2, 2005, regarding Stack's right shoulder, therefore, does not constitute a "good reason" to disregard the rest of his medical opinions in the record.

Next, the ALJ indicated that she would not give Dr. Fischer's medical opinions significant weight because he reasoned that Stack had "moderate severity, but she can lift 20 pounds." (Tr. at 27). This is not the sort of inconsistency, however, that warrants the dismissal of all of Dr. Fischer's medical opinions. The fact that Dr. Fischer categorizes Stack's inability to lift more than 20 pounds as a "moderately sever[e]" limitation does not

undermine the credibility of the rest of Dr. Fischer's testimony.  The label that Dr. Fischer attributes to his medical opinion that Stack can lift no more than twenty pounds has no bearing on his competency to assess Stack's medical condition.  Dr. Fischer's finding that Stack can lift only twenty pounds is not inconsistent with other evidence in the record. (*See* Tr. at 282 (noting the Administration's Dr. Larson's evaluation that Stack cannot lift more than 20 pounds)).

The ALJ also states that she dismissed Dr. Fischer's medical opinions because his recommendation of a repeat arthroscopy (Tr. at 250) is in contradiction to "his review of the April 2005 MRI which found no abnormalities, only mild to minimal changes." (Tr. at 27). A review of the record, however, reveals that no such contradiction exists.  On April 2, 2005, Dr. Fischer made the following medical notes:

> "At this point I told Susian I am not sure if this MRI can fully explain all of the discomfort that she is having.  I do see by MRI that her labrum has healed which was her initial injury.  I told her at this point I would like to try a subacromial injection today to see if we cannot get some resolution of her symptoms.  Based on that it would certainly determine whether we need to repeat her arthroscopy or not."

(Tr. at 250).  Thus, Dr. Fischer's recommendation of a repeat arthroscopy surgery was not in contradiction to his conclusion that the MRI revealed only mild to minimal changes, but rather, he recommended the repeat surgery *because* of the perceived discrepancy between the results of the MRI and his patient's continued complaints of pain and suffering.  The ALJ's finding that Dr. Fischer both interpreted the MRI as showing "only mild to minimal changes" and concluded that Stack should undergo a repeat arthroscopy, therefore, does not constitute a "good reason" to dismiss all of the doctor's medical opinions in the record.

16

Finally, the ALJ disregarded Dr. Fischer's medical opinions because the ALJ found there was "no basis for Dr. Fischer's opinion that the claimant's pain would often interfere with her attention and concentration, as she is treated only with ibuprofen." (Tr. at 27).  The ALJ's statement in this regard, however, may be considered reversible error because "the ALJ must not substitute h[er] opinions for those of the physician." *Ness v. Sullivan*,  904 F.2d 432, 435 (8th Cir. 1990); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)("An administrative law judge may not draw upon his own inferences from medical reports."). The ALJ has not cited to any medical opinions in the record that substantiate her opinion that Dr. Fischer's decision to treat Stack with ibuprofen undermines the validity of his assessments of her medical condition.  The fact that Stack's symptoms are treated with ibuprofen, therefore, is not a "good reason" for the ALJ to discredit the medical opinions of Stack's treating physician.

The Court concludes that the ALJ committed reversible error when she failed to give Dr. Fischer's medical opinions substantial weight and instead relied solely on the medical opinions of consulting physicians who had seen Stack only once, if at all. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)("[T]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence. . . .There is no evidence in the record to support the ALJ's [decision] other than the non-treating physicians' assessments. These assessments alone cannot be considered substantial evidence in the face of the conflicting assessment of a treating physician.")(internal quotations omitted).

When the VE was asked to take into consideration Dr. Fischer's medical opinion regarding Stack's ability to work, the VE concluded that Stack "would not be able to

17

maintain employment over– for a long period of time with an employer." (Tr. at 396).  As a result, the ALJ's decision that Stack does not suffer a disability is not supported by the VE's answer to the ALJ's hypothetical, and the Court reverses the ALJ's final decision. *Pickney v. Chater*, 96 F.3d 294, 297 (8th Cir. 1996) ("It has long been the rule in this circuit that a hypothetical question posed to an ALJ must contain all of claimant's impairments that are supported by the record.").  The Court remands the case to the Commissioner for proper consideration of Dr. Fischer's medical findings regarding Stack's limitations.

### 2.    Error in Dismissing the Third Party Opinions of Cusik

The Court also finds that the ALJ's failure to consider and give weight to Cusik's opinions regarding Stack's mental health impairments constitutes error.  Upon review of the record, the Court concludes that the substantial evidence in the record does not support the ALJ's determination that Cusik's opinions are not credible.  Instead, the Court finds that the ALJ should have considered and weighed Cusik's opinions in accordance with the prescriptions the Commissioner has set out in Social Security Ruling ("SSR") 06-3p, 71 Fed.Reg. 45,593 (Aug. 9, 2006).

As a licensed clinical social worker, Cusik is not an "acceptable medical source," but rather, Social Security Ruling ("SSR") 06-3p categorizes Cusik as an "other source."  The Eighth Circuit Court of Appeals has interpreted SSR 06-3p, and explained that:

> Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p. Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

*Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007)(internal quotations omitted).

18

The Eighth Circuit Court reasoned that opinions like those of Cusik have recently increased in importance because "licensed clinical social worker[s] have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." *Id.* As a result, opinions from licensed clinical social workers "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* at 888-89. Indeed, "[d]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." *Id.* at 889.

In accordance with SSR 06-3p, before an ALJ may dismiss the opinions of another source such as Cusik, the ALJ must consider the following factors:

> • How long the source has known and how frequently the source has seen the individual;
> • How consistent the opinion is with other evidence;
> • The degree to which the source presents relevant evidence to support an opinion;
> • How well the source explains the opinion;
> • Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
> • Any other factors that tend to support or refute the opinion.

SSR 06-3p. Here, the ALJ has not considered all of the factors. The ALJ explains that her dismissal of Cusik's opinions is based on the ALJ's finding that "there are no office progress notes to support her conclusion. . . [and that her] opinion does not comport with the opinion of the consultative examiner, Dr. Blake." (Tr. at 28). In light of the substantial evidence in the record, however, these two stated reasons do not warrant the dismissal of Cusik's opinions.

19

While the record does not contain Cusik's progress notes taken during the course of Stack's counseling, the record contains sufficient evidence to explain the opinion. Cusik states that Stack suffers from major depressive disorder: recurrent; and adjustment disorder: depressed mood. (Tr. at 176). To support this opinion, Cusik explained that she:

> has been seeing Susan Stack as a client since 10/1/03. Susan has presented with symptoms of major depression which developed into suicidal ideation with attempt. This consequenced into an in patient hospitalization in Lincoln NE. Susan's symptoms included limited ability to sleep, limited ability to eat and nervousness. Her agitation combined with sleep deprivation was significant. Susan has multiple physical aliments which include: female problems, neck back problems and stiffness/soreness in her shoulder. Susan has been compliant with her mental health care . . . As one of her providers, it is very clear to me, she at minimum requires some medical help. This is a very sick woman both mentally and physically and without proper intervention will likely be a revolving door in patient client. Please consider her case carefully and contact me if you have any further questions.

(Tr. at 222-223). While the record does not contain Cusik's progress notes, the record does contain Cusik's explanation for her assessment – an explanation that points out numerous examples of relevant evidence found within the record that provide ample support. The record also contains a "Mental Impairment Evaluation" that Cusik completed and provided to the Administration; this evaluation contains even greater detail to support Cusik's opinions. (*See* Tr. at 301-311).

The ALJ failed to discuss the other factors that SSR 06-3p requires the ALJ to consider, such as the length of time Cusik has spent working as Stack's licensed clinical social worker, how well she knows Stack, and the extent to which Cusik's work in the area of mental health may afford her a degree of special expertise.

Finally, the only inconsistency the ALJ noted in Cusik's opinion is its inconsistency with the opinion of one of the Commissioner's consulting physicians, Dr. Blake, who

20

reasoned that Stack had a GAF of 60.  Yet, as an opinion from a consulting physician who only saw Stack on one occasion, Dr. Blake's medical opinion is not the equivalent of substantial evidence on the record. *See Singh*, 222 F.3d at 452 ("[T]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.").  Consequently, Dr. Blake's medical opinion does not support the conclusion that Cusik's opinion is inconsistent with the evidence on record. Instead, upon review of the record, the Court finds that Cusik's opinion is consistent with the evidence on record, including Stack's medical records reporting her ER visit, Dr. Fisher's progress notes, and Stack's own subjective statements. *See, e.g.,* (Tr. at 179-181)(indicating that Jasung Kim, M.D., examined Stack in the ER and diagnosed her with personality disorder and bipolar/mood disorder, and assigned Stack a GAF score of 29 and later a score of 45 when she was dismissed). There simply is not adequate evidence on record to undermine the consistency of Cusik's opinions with the record of evidence as a whole.

When the VE was asked to consider Stack's mental impairments, as defined by Cusik, the VE concluded that Stack would not be able to perform work in the national economy. (Tr. at 395).  Accordingly, the Court concludes that the ALJ committed error when she discredited the opinions of Stack's licensed clinical social worker without fully considering the factors the Commissioner has set forth in SSR 06-3p, and consequently, this case should be remanded to the Commissioner. *See Sloan*, 449 F.3d at 889 (holding that "remand is appropriate [when the Plaintiff has] presented evidence from her health-care providers which could very well have led to a different result had the ALJ assessed them in accordance with SSR 06-3p.").

21

**3.    Assessment of the Credibility of Stack's Own Subjective Statements**

Finally, Stack contends that the ALJ erred in dismissing the credibility of her subjective complaints of pain and mental illness. Given that the Court has already found the ALJ's decision to be in error, the question of Stack's credibility is now moot.  The Court limits its reversal and remand to the matters of the ALJ's failure to consider Dr. Fischer's medical evidence in the record, and Cusik's opinions, as well as the improper hypothetical posed to the VE that did not include all of Stack's limitations.

**CONCLUSION**

For the aforementioned reasons, the Court concludes that the final decision of Commissioner is not supported by the substantial evidence in the record.  The Court, therefore, remands this case to the Commissioner for further proceedings, consistent with this Memorandum and Order.

IT IS ORDERED:

1.    This matter is remanded to the Defendant, Commissioner of the Social Security Administration, pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order; and

2.    A separate Judgment will be filed.


DATED this 1st day of April, 2009.

                              BY THE COURT:


                              s/Laurie Smith Camp
                              United States District Judge


22